May it please the Court, I'd like to start by addressing what I think is the most important issue in this appeal, which is the District Court's denial of the motion to suppress evidence seized in the Arkansas traffic stop, and then I'd like to address the defendant's enhancement as a clear offender. As this Court is well aware, in order to comport with the Fourth Amendment, a traffic stop must be justified at its inception. Legal justification for the stop must be objectively grounded. When we're talking about a traffic violation, it must be objectively grounded in the State's transportation code. Now, in this case, there's no probable cause for the stop because no traffic violation occurred, and there's no reasonable suspicion for the stop because the violation that purportedly occurred is not objectively grounded in the Arkansas transportation code. Now, Officer Penner here, when he stopped Defendant Henry Bams, stated that he made an unsafe lane change. Now, what he relied on in concluding that an unsafe lane change had been made is 2751.305 of the Arkansas transportation code, which deals with following too closely another vehicle. What Officer Penner said was that when Mr. Bams changed lanes, he did not maintain a distance of at least 200 feet between his vehicle and the vehicle behind him, making the lane change unsafe. That provision of the statute applies to drivers and the distance that they maintain between their vehicle and the vehicle in front of them. It does not place a duty on Arkansas drivers to maintain a specified distance between their vehicle and the vehicle behind them. Mr. Penner also relied on 2751.306 of the Arkansas transportation code, which deals with overtaking vehicles passing in the same lane. Again, this provision does not deal with a lane change. It applies to passing vehicles. What that provision says is that the driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left at a safe distance and shall not again drive to the right until safely clear of the overtaken vehicle. In this case, Officer Penner testified that Mr. Bams kept a distance of about 50 feet between his vehicle and the vehicle behind him when he changed lanes. According to Mr. Vehicle, this was unsafe. There is nothing in the record to indicate that Mr. Bams did not safely clear the vehicle behind him when he changed lanes. And I just want to be clear. You're not saying 2751.306 isn't applicable in this case, are you? That's not what you're saying. No, Your Honor. I'm not. I don't think 27306 actually applies. On its face, it applies to passing vehicles. On its face, it does not oppose a requirement that a driver changing lanes, you know, do anything. That said, even if it does apply, I guess I don't understand the difference. Passing a vehicle is to go past it and then cut back in the same lane that that vehicle is in that you passed. Is that what passing a vehicle is? Correct, Your Honor. How is this different? Well, in this situation, Mr. Bams merely moved over. He wasn't speeding past a vehicle, in which case you would obviously need to make sure that you have safely cleared that vehicle. Mr. Bams was already safely clear of the vehicle when he moved over. So on its face, the statute doesn't apply. Even if the statute did apply, there is absolutely no evidence in the record that the lane change that he did not safely clear that vehicle. There's no evidence that the vehicle behind him slammed on its brakes. There's no evidence that he got in front of the vehicle and was then following another vehicle too closely. I mean, there's absolutely no evidence in the record that the driver behind him was put in any type of distress. And I would point out to the court that not only is there no evidence that the lane change that he didn't safely clear the vehicle, but the Arkansas Transportation Code also places a burden on Arkansas drivers who are being passed or overtaken to yield to the passing driver. In 2751-306, the second subsection of that statute, it states that a driver of an overtaken vehicle shall yield to the right in favor of the overtaking vehicle and shall not increase his speed until completely passed. So the duty is on the driver being overtaken to yield to the passing vehicle. The same duty is placed on a driver under the following too closely rule. The Arkansas Transportation Code places a duty. But that doesn't mean that the driver who's actually doing the passing doesn't have some duty, does it? I mean, the safely clear, if that statute applies, would apply to the driver who's doing the passing. I don't disagree with that, Your Honor. I mean, assuming the statute applies, it says that the passing driver would have to safely clear. In this case, there was a distance of 50 feet. And again, there is no evidence that the vehicle was not safely cleared. I was unable to find any Arkansas state cases specifically analyzing the circumstances of this situation. But I would note for the Court that in the only two cases that I found even referencing an unsafe lane change as justification for a stop, in one of those cases, the officer noted that when the driver changed lanes, he saw the driver behind slam on his brakes, indicating that driver was put in distress. Now, I'll note in that case that the appellant did not challenge the reason for the stop as a justification, so it wasn't specifically analyzed by the Court. The only other one I found was a case where the driver had changed lanes and then failed to maintain a distance of 200 feet between himself and the vehicle in front of him. So... But your argument is, is it more than just simply saying that the officer made a mistake in concluding that it was not reasonably safe? Well, Your Honor, the argument is that there's no, under the Fourth Amendment, there's no legal justification because whether we're talking about probable cause and a clear traffic violation or reasonable suspicion that a traffic violation occurred, it has to be reasonably grounded. The officer's belief that a traffic violation occurred is not reasonably grounded in the Arkansas Transportation Code, the statutes at issue here. Well, I mean, he's going to make that determination, though. I mean, it seems to me that that's something the officer has to make, and he can't get out and measure, you know, with so many feet. He's got to make a reasonable judgment. Somebody's got to make a reasonable judgment, and the responsibility to do that is him. Correct, Your Honor. And it's hard to challenge his decision. Well, this Court has, time and time again, refused to incorporate a broad good-faith exception into an analysis of whether a stop was justified at its, excuse me, at its inception. And the United States Supreme Court has said that reasonable suspicion can rest on a mistake of law, can, but it has to be objectively grounded in the Transportation Code statutes allegedly violated. The reason the Court— That's Hines v. North Carolina. I'm sorry, Your Honor? Supreme Court opinion. Hines v. North Carolina. I don't know. Yes, Your Honor. And, you know, the reason for that, and the courts have been unwilling to accept a broad good-faith exception, is because otherwise it would completely swallow the Fourth Amendment. An officer would always be able to say he had a subjective belief that a traffic violation occurred, so the courts have kind of carved out this— So are you quarreling with the officer's subjective determination about what amounted to safely clear, or are you saying it was unreasonable for him to base his determination that there was a violation on this statute which had to do with the overtaken vehicle following too closely the one vehicle that was passing? Both. You're claiming both? Yes, Your Honor. All right. Yeah, I'm claiming that these statutes are not ambiguous on their face. They don't apply to the situation— Well, it's not ambiguous to the extent everybody agrees what safely clear means. Is there any definition of safely clear? Your Honor, there is not a definition of safely clear, but again, there's absolutely no evidence to indicate that he did not safely clear the vehicle, like I mentioned— Except the officer's testimony. The officer's testimony specifically about the distance that he felt should be maintained between the driver and the vehicle behind him. Arkansas law doesn't impose a duty on drivers to maintain a specified distance between themselves and the vehicles behind them, presumably because— Well, it's specified in the sense that it's safe. It's a safe distance, and who makes that determination other than the highway patrolman who's responsible for enforcing the laws? Well, I think the State of Arkansas makes that determination when it writes its code. But he represents the State of Arkansas. I mean, on the highway. The Arkansas Transportation Code, Your Honor, and I will mention that the only express provision that speaks to restrictions on overtaking speaks to passing in the lane of oncoming traffic, and that specific provision does state that a driver has to move back over into the right lane before it comes within 100 feet of oncoming drivers. So, there are provisions in the code which place restrictions and set forth specified distances that must be kept. But here, there is no express provision expressly relating to lane changes or specifically stating that a certain distance must be maintained. Presumably, it would be very difficult for a driver to estimate an approximate distance between itself and a driver behind it. Right now, Doctor, do you have other arguments relating to your Fourth Amendment? I do, Your Honor. The next thing I wanted to do was to address the Court about the defendant's enhancement as a career offender. And I wanted just to clarify for the Court, in regards to the issue raised in the reply brief, the defendant filed a pro se motion in this Court specifically requesting that a separate subsection of the Wisconsin Controlled Substances Act then was referenced in the PSR. When I went to the record to— I thought you had a Fourth Amendment argument relating to the detention. Oh, yes, Your Honor. I'm happy to address the Court. Well, I mean, it's up to you. I'm happy to address the Court about that, Your Honor. Yeah, so the detention was not reasonably related in scope to the stop. And one thing I do want to point out for the Court is that if it watches the video, you will see that the officer's reason for the detention becomes even more suspect because on the video, the officer can be seen. He does not immediately pull over, Mr. Bams. Obviously, the lane change is not on the video, but he follows him for three or four miles after the purported unsafe lane change, comes up next to Mr. Bams so that he can peer inside of his car, gets back behind Mr. Bams, and then initiates the traffic stop. Is there any evidence that they were looking for him specifically? There is no evidence that they were looking for him specifically, Your Honor. He pulls over, Mr. Bams, and based on observations of nervousness, what he called a single key in the ignition of the car, and what he referred to as a cold coffee or caffeine drink, those three observations coupled with his stated observation that the rear quarter panels of the car had been tampered with. Had they been tampered with? Was there evidence that his observation was supported by the facts? Well, that observation, that particular observation is supported by the fact that they found 10 kilograms of cocaine hidden in those compartments. However, under the cases that have come out of this court, things like nervousness, a single key in the ignition of a car or a caffeine drink, those types of things are too scant to give rise to additional reasonable suspicion that would justify, you know . . . Is there anything about the summons that you want to draw to our particular attention, because you've just got about 45 seconds left? Your Honor, I would just ask that the court give careful consideration to the defendant's enhancement as a career offender. It is based solely on concurrent state and federal convictions that were based on the same underlying conduct, which occurred when the defendant was a juvenile, particularly between the ages of 15 and 17. This is not a situation that I've been able to find in any court, really, where a defendant was enhanced as a career offender based solely under these circumstances. You know, old convictions based on juvenile conduct, just state and federal concurrent convictions. How old is the defendant now? I'm sorry, Your Honor? How old is the defendant at the time of his arrest? At the time of his arrest? At the time of his arrest for the instant conviction, I believe he is in his 40s. Okay. Thank you very much, Ms. Montesquieu. Ms. Gaston, representing the United States, we'll hear from you. May it please the Court. I will address the same issues that were addressed by Mr. Bams's counsel, primarily the district court's decision on the motion to suppress and then also the career offender determinations that were made by the district court. Now, in regards to the traffic stop, Trooper Penner did have, based on Arkansas law, a reason, a justified objective reason for conducting the initial traffic stop, based on his personal observations and also his reading and understanding of what Arkansas requires of drivers in particular situations. Trooper Penner testified that he was traveling in the left-hand lane when he observed the traffic violation and observed Mr. Bams's vehicle move back in front of another vehicle. Now, what was important in this particular case is that the vehicle that Mr. Bams moved back in front of was not a regular passenger vehicle but was a tractor-trailer, 18-wheeler vehicle. Now, under Arkansas law, as has been discussed in the briefs and here before the Court today, there are a few different statutes that are at play. And again, the government has not been able, when it comes to Arkansas statute 306, has not been able to find any case law that would interpret what safe passage is. And so in looking at what the officer determined, he looked at that statute, he looked at his experience on the roads, and he also looked at the statutes that specifically relate to tractor-trailers, and in particular subsection 305. Now, in that particular subsection, it shows that Arkansas as a state placed an increased burden or a specific burden on tractor-trailers in regards to requiring that they maintain a greater distance, a distance of 200 feet behind any vehicle that's traveling in front of them. Now, in making the determination that Mr. Bams did not safely pass, did not safely come back in front of the tractor-trailer, Trooper Penner testified that when he is, in his experience, a tractor-trailer is heavier, is bigger, potentially carrying a very heavy load, and that the reaction time of that vehicle, if something were to occur. So I'm trying to be patient, but I'm really trying to, I'm hoping you're going to hurry up and tell me why Mr. Bams would, that places some duty on him as the vehicle that's passing the tractor-trailer. Yes. That statute places a duty on the passing vehicle? Is that your contention? That statute, the 306, yes. I'm supposed to make sure the tractor-trailer stays 200 feet at least behind me? No, sir. So if he starts getting real close to me, I need to go over the speed limit to make sure there's a 200 feet? Is that? No. All right. No. You're going to explain to me how, what Mr. Bams' duty is under this statute that has to do with the tractor-trailer. Your Honor, I can explain what his duty is under the statute that regards safe passage. And his duty is that he not return to a lane of travel in front of a vehicle until it's safe to do so. And in this particular case, because the vehicle that he was pulling in front of is a heavier, larger vehicle moving at approximately 65 miles per hour, there is going to need to be a greater distance. I can agree with all that. Tell me why that statute that says the 200 feet that the tractor-trailer driver is supposed to maintain opposes the duty. You're not arguing that statute? No. No. All right. And Trooper Penner testified that the reason he made the stop was for unsafe lane change, which is 306. All right. He testified that in regards to if it was two passenger vehicles, he relies a lot on the two-second rule, which was discussed in briefings to the district court. Now, in determining what is safe when the other vehicle is a tractor-trailer, he used, and in this particular situation, used a distance of 200 feet because of the various things that could happen and how a tractor-trailer is going to react differently. Now, the Arkansas statute does put a burden on a vehicle that's being passed to yield, and so that's to prevent situations, as many people have seen, where someone's trying to pass and then the car speeds up to prevent you from getting back in front of them. However, the burden is still on the driver and on the person switching lanes or passing to do so safely. And in this particular reason, based on the statutes that were available, based on his understanding of those statutes, based on his experience as a trooper on the highways for many years, he deemed what Mr. Bams did to be unsafe and therefore a violation of the laws. And he had an objective reason, a reasonable reason, based on the Arkansas law at the time in order to conduct the traffic stop. And when the traffic stop occurred, as can happen in any traffic stop, once you approach that vehicle, things can begin to change, and they began to change here, in that he approached the vehicle on the passenger side, came in contact with Mr. Bams, who was the driver, and with Mr. Mitchell, who was the passenger, and immediately began noticing things that added up to reasonable suspicion of additional criminal activity. That included nervousness, single key, the presence of caffeine. It included being able to look over to the rear. I'm assuming there's some nervousness in addition to the nervousness that most of us feel when we get pulled over by a cop. Well, and that's why Trooper Penner, he continued throughout his testimony, both the motion to suppress and trial, to talk about a totality. So he didn't take one particular instance. He didn't take the key by itself or nervousness by itself and say, oh, now I have reasonable suspicion. There were a number of factors that continued to compound as the traffic stop continued that led to reasonable suspicion. When did he observe the panel that was loose or had been tampered with? Was that at the same time he made the observation of the other factors as well? I believe that's how it's articulated, Your Honor, that he approached on the passenger side of the vehicle, and what he observed, the panel that he discussed observing that had been tampered with, would have been across from him behind the driver. And ultimately, after the search was conducted, cocaine was found on both sides of the vehicle, a total of approximately 10 kilograms. So there actually was a hidden compartment in that location that he observed, and it did contain cocaine. Okay. Now, also- I really don't see that a can of caffeine drink is much reason to suspect criminal activities of what- And again, Your Honor, by itself- People drink that stuff all the time. Ordinary people that haven't got crime within a thousand miles of their mind. And by itself, it would not be. But taking into consideration all of the things that Trooper Penner observed, the travel information that was given to him by both Mr. Bambs and Mr. Mitchell, the time of day of the stop in comparison to where they said they were traveling from, and all of the other factors, he took all of this into consideration when he was developing reasonable suspicion and having reasonable suspicion. Did anyone ask him why he followed this vehicle for four miles? They did. I believe in both the motion to suppress and trial, trial counsel for defense spoke to him about that. And what did he say? In one instance, he couldn't recall exactly, but stated that- and later he would talk about, in his experience, approaching a vehicle to determine if the occupants were wearing seatbelts or not and also to determine how many occupants were in the vehicle before he would conduct a traffic stop. So therefore, the government would ask that because Trooper Penner was justified in his initial stop and was justified in his detention, and therefore the consent that was obtained was valid and the search was good and the decision of the district court was valid and that we would ask that you affirm the district court's ruling as to the motion to suppress the Arkansas stop. And I'll move into career offender discussions because that was what was raised here before the court. Obviously, career offender determinations were very important here because the district court did find that Mr. Bambs was a career offender and made that determination on the underlying offenses of a federal conviction for conspiracy and also a state conviction for possession with intent to distribute. And as has been presented in briefings and in the 28J letter, the state statute is a valid qualifying offense. It really doesn't seem fair, though, to call somebody a career offender on the basis of two offenses if they all arise from the same identical episode. I mean, I guess what is the law exactly on that one when you have these simultaneous state and federal convictions for the same facts? And that's what happened here, right? The argument that has been presented and the information that's available regarding the federal conviction is that there was other offense conduct beyond the December 1991 search warrant. So conspiracy and the elements of a federal conspiracy, especially in regards to the fact of the existence of an agreement and the fact that a conspiracy can take into account more than just one act, there are different elements between a federal conspiracy and then a state possession with intent to distribute. And there was information that was presented through available records or records that were made available to the district court that there were some other factors that were taken into consideration in the federal conviction. Now, in regards to fairness? Well, I mean, you know, fairness doesn't always have anything to do with the law. I well understand that. Well, in this particular situation, the district court did take the connection between the federal statute and the state statute into consideration, and that's in the record at the sentencing hearing whenever the district court addressed that. I mean, there's no question. I mean, there are two convictions. I mean, I'm not arguing about that. I'm just saying if you want to label somebody a career offender, it doesn't seem appropriate to build his career status on one episode. That's all I'm saying. And under the guidelines, Your Honor, as long as both are qualifying convictions and both receive criminal history points, then under the guidelines and under the understanding of the separate sovereign state and federal, then legally they can be counted. Now, in regards to an equitable or fairness argument, that's something that can be raised in front of the district court and was raised in front of the district court, and the district court did take that into consideration in assessing sentence. Even though the district court found that Mr. Bams was a career offender, the district court did question the government as to why in this particular case, because of the connection between the underlying offenses, that a downward variance should not be granted. And ultimately the district court did decide to grant a downward variance and sentence Mr. Bams below the guidelines as they were calculated by probation. Now, in regards— What kind of sentences did he get? How many months did he get? In this particular case, he got 240. His guidelines were 360 to life. And so the district court questioned the government. Pretty tough. Well, a lot of— How much cocaine did he have? In what was seized from the Arkansas traffic stop was approximately 10 kilograms. The indictment alleged over 5 kilograms of cocaine, and then obviously during trial the government presented evidence of other trips that were part of the conspiracy. But what was seized was the 10 kilograms out of the Arkansas traffic stop. I suppose some of the evidence relating to his sentence had to do with the fact that he must have been a big-time dealer with a long record of dealing and not being caught or something like this. Well, and that's argument that was presented in both orally in front of the district court and through motions is that Mr. Vance did have previous convictions, the federal and state convictions that we talked about. They were significant sentences back then. And he served his sentence, came out on supervised release, and then continued to engage in drug trafficking behavior. And so career offender statutes, recidivist guidelines, and statutes that are— are critical situations where someone continues to commit offenses against the United States of America. In regards to the sufficiency of the evidence, which was the last that was raised in briefings, obviously taking into consideration all of the evidence that was presented at trial, especially the evidence of the two traffic stops that occurred in this particular case and were presented at trial, then the government would urge this court to find that the elements were established as to each count in the indictment, that the determinations by the district court regarding the motion to suppress were appropriate and were valid and were correct, and affirm Mr. Bams's sentence as to both counts. Okay. Thank you very much, Ms. Gasson. Ms. Matuska? Did I pronounce your name correctly? Is it Matuska? Matuska. Matuska. It's Polish. To answer the court's question, what is the law exactly when someone is enhanced as a career offender based solely on concurrent state and federal convictions, I think that is somewhat of an open question considering that no court has head-on addressed that issue. On the face of the sentencing guidelines, these convictions would qualify as separate convictions. I mean, we can read the rule. There is no intervening arrest because an arrest was not, the defendant was not arrested for the first offense before committing the second offense, and under the rule, these offenses were not dealt with in the same charging instrument nor was he sentenced on the same day. However, in a situation where somebody is convicted of state and federal concurrent sentences, for practical purposes, there would probably be no situation. Well, we know there would be no situation where they were addressed in the same charging instrument, and from a practical standpoint, there would probably never be a situation where they were sentenced on the same day. Well, that should just be brought to the attention of the Sentencing Commission, I suppose, to change 4A.1.2. Well, I would just like to point to the Court's attention that neither the rule on its face nor the application notes specifically address this scenario. And, you know, I would note for the Court that in this case, the decision of the court to do so is not satisfied. I understand, but you read us the provision. It says they're counted separately unless A or B, and A or B is not satisfied. I mean, that's so that's got to be the end of it. If it's a flaw in the guidelines or in oversight, then that's why we have a Sentencing Commission. Well, I would just note for the Court that he was sentenced. His sentence in the state conviction and federal conviction occurred only three days, three days apart. In terms of the Court's question and assumption that the defendant must have been a big-time drug dealer to get all this time, the answer to that question is no. The defendant's prior convictions were a slew of juvenile convictions. This is a person who was sort of enthralled in this lifestyle by his family at a very young age and who was sentenced at, I believe, 19 years old to a significant amount of time. When he came out, he was only out for the span of a few years before he went back in on these charges. So he was not a big-time drug dealer. He was a kid who was committing this conduct, which has gotten him in this position as a career offender. How long did he stay in jail from the age of 19? He went in in 93 and was released in 2009. I mean, it was a significant period. So, again, I would just urge the Court to take a close look at the enhancement as a career offender. And, again, based on the juvenile offenses, it is our position that he was improperly enhanced. The career offender rules state that it has to be adult convictions. Now there is documents in the record that establish that the Wisconsin State Court certified him as an adult. As to the federal conviction, our position is the record is insufficient to establish an adult conviction. The application notes of the 4B1.2 state that a federal conviction for an offense committed prior to a defendant's 18th birthday is an adult conviction if the defendant was expressly preceded against as an adult. And I think in this case, the record would really have to establish either he was certified under the Juvenile Delinquency Act or it would have to at least have reliable information to support a finding that he did continue to engage in this conspiracy after his 18th birthday. Trial counsel adamantly objected in that regard. The PSI from the Wisconsin District Court is not in the record before this Court for this Court to make that determination. And I would just close in saying, Your Honor, that in regards to the initial stop, I would just reiterate to the Court that none of the statutes relied on by the government in this case place a burden on the driver to estimate a specified distance between itself and a car that it is overtaking when it changes lanes and there was no reasonable suspicion for the stop. That's the reason the District Court prepared. Thank you, Ms. Matuska. And you are court-appointed and the Court certainly appreciates the good services that you've rendered on behalf of your client and on behalf of the Court. Thank you, Your Honor. We'll call the next case of the day.